UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CINDY ANN BEAUCHAMP,

      Plaintiff,

v.                                                       Case No. 2:20-cv-185-NPM

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____

**OPINION AND ORDER**

Cindy Ann Beauchamp seeks judicial review of a denial of her application for Social Security disability insurance benefits. The Commissioner filed the transcript[1] of the proceedings, and the parties filed a Joint Memorandum (Doc. 20). As discussed in this opinion and order, the decision of the Commissioner is affirmed.

**I.    Eligibility for Disability Benefits and the Administration's Decision**

    **A.    Eligibility**

The Social Security Act and related regulations define disability as the inability to do any substantial gainful activity by reason of one or more medically determinable physical or mental impairments that can be expected to result in death or that have lasted or can be expected to last for a continuous period of not less than

---

[1] Cited as "Tr." followed by the appropriate page number.

twelve months.[2] Depending on its nature and severity, an impairment limits exertional abilities like standing or reaching, nonexertional abilities like seeing or hearing, or aptitudes necessary to do most jobs such as using judgment or dealing with people.[3] And when such functional limitations preclude a return to past work or doing any other work sufficiently available in the national economy (or an impairment meets or equals the severity criteria for a disabling impairment as defined in the regulatory "Listing of Impairments"), the person is disabled for purposes of the Act.[4]

### B.   Procedural history and factual background

Beauchamp is 64 years old, has a ninth-grade education, and previously worked as a steel mill dispatcher. (Tr. 33, 42, 47). On June 2, 2017, she applied for disability insurance benefits, claiming she was unable to work due to disabling conditions beginning May 13, 2017. (Tr. 103, 188). This claim for benefits was administratively denied initially on October 2, 2017, and upon reconsideration on December 22, 2017. (Tr. 103, 113).

---

[2] *See* 42 U.S.C. §§ 416(i), 423(d), 1382c(a)(3); 20 C.F.R. §§ 404.1505, 416.905.

[3] *See* 20 C.F.R. §§ 404.1594(b)(4), 416.994(b)(1)(iv); *see also* 20 C.F.R. §§ 404.1545(b)-(d) (discussing physical, mental, and other abilities that may be affected by impairment(s)), 416.945(b)-(d) (same), 404.1522(b) (providing examples of abilities and aptitudes necessary to do most jobs), 416.922(b) (same).

[4] *See* 20 C.F.R. §§ 404.1511, 416.911(a).

At Beauchamp's request, Administrative Law Judge Raymond Rodgers held a hearing on March 6, 2019. (Tr. 39-76). The ALJ issued a decision on April 11, 2019, and found Beauchamp not disabled since the date the application was filed. (Tr. 24-33).

Beauchamp's timely request for review by the administration's Appeals Council was denied. (Tr. 1-6). She then brought the matter to this Court, and the case is ripe for judicial review. The parties consented to proceed before a United States Magistrate Judge for all proceedings. (*See* Doc. 21).

### C. The ALJ's decision

An ALJ must perform a five-step sequential evaluation to determine if a claimant is disabled. 20 C.F.R. § 404.1520(a)(1)). This five-step process determines:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether these impairments meet or equal an impairment listed in the Listing of Impairments; (4) if not, whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) if not, whether, in light of his age, education, and work experience, the claimant can perform other work that exists in "significant numbers in the national economy."

*Atha v. Comm'r, Soc. Sec. Admin.*, 616 F. App'x 931, 933 (11th Cir. 2015) (internal quotation omitted); *see also* 20 C.F.R. § 404.1520(a)(4).

The governing regulations provide that the Social Security Administration conducts this "administrative review process in an informal, non-adversarial manner." 20 C.F.R. § 404.900. Unlike judicial proceedings, SSA hearings "are

inquisitorial rather than adversarial." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1364 (11th Cir. 2018) (quoting *Sims v. Apfel*, 530 U.S. 103, 111 (2000) (plurality opinion)). "Because Social Security hearings basically are inquisitorial in nature, '[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.'" *Id*. Indeed, "at the hearing stage, the Commissioner does not have a representative that appears 'before the ALJ to oppose the claim for benefits.'" *Id*. (quoting *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000)). "Thus, 'the ALJ has a basic duty to develop a full and fair record. This is an onerous task, as the ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'" *Id*. (quoting *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015)).

Nonetheless, while the claimant is temporarily relieved of the burden of production during step five as to whether there are enough jobs the claimant can perform, the claimant otherwise has the burdens of production and persuasion throughout the process. *Washington*, 906 F.3d at 1359; 20 C.F.R. § 404.1512 (directing that the claimant must prove disability); *see also Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983) ("The scheme of the Act places a very heavy initial burden on the claimant to establish existence of a disability by proving that he is unable to perform his previous work."); *Doughty v. Apfel*, 245 F.3d 1274, 1280

(11th Cir. 2001) ("[T]he overall burden of demonstrating the existence of a disability as defined by the Social Security Act unquestionably rests with the claimant.").

In this matter, the ALJ found Beauchamp met the insured status requirements through December 31, 2022. (Tr. 26). At step one of the evaluation, the ALJ found Beauchamp had not engaged in substantial gainful activity since May 13, 2017, the alleged onset date for disability. (Tr. 26). At step two, the ALJ characterized Beauchamp's severe impairments as: "Status post compression fracture at Ll-L2; fibromyalgia; chronic obstructive pulmonary disease (COPD); and Hashemotos [sic] disease." (Tr. 26). At step three, the ALJ determined Beauchamp did not have an impairment or combination of impairments that met or medically equaled the severity of an agency-listed impairment. (Tr. 28).

> As a predicate to step four, the ALJ arrived at the following RFC:
>
> [T]he claimant maintains the following residual functional capacity: Lift/carry 10 pounds occasionally and 5 pounds frequently; sit for six hours in an eight hour workday; stand and/or walk for two hours in an eight hour workday; no operation of foot controls; permitted to stand and stretch every 30 minutes while staying on task; occasional climbing of ramps or stairs; occasional balancing, stooping, kneeling and crouching; no crawling; occasional overhead reaching; frequent handling and fingering; must avoid concentrated exposure to pulmonary irritants such as fumes, odors, dust, and gases; and no exposure to hazardous machinery.

(Tr. 29). Consequently, the ALJ determined Beauchamp was capable of performing her past relevant work as a dispatcher (DOT 249.167-014, sedentary, semiskilled) as it is generally performed in the national economy.

## II. Analysis

Beauchamp's appeal suggests the ALJ erred by not arriving at an RFC that limited Beauchamp to no more than unskilled work based on evidence from a psychological consultative exam and a questionnaire completed by a family nurse. Specifically, the appeal asks us whether substantial evidence supports the ALJ's conclusion that these forms of evidence were unpersuasive.

### A. Standard of Review

The Court "may not decide the facts anew, make credibility determinations, or reweigh the evidence." *Buckwalter v. Acting Comm'r of Soc. Sec.*, 997 F.3d 1127, 1132 (11th Cir. 2021). While the Court must account for evidence both favorable and unfavorable to a disability finding and view the evidence as a whole, *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), the Court's review of the administration's decision is limited to determining whether "it is supported by substantial evidence and based on proper legal standards." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1280 (11th Cir. 2020) (quoting *Crawford*, 363 F.3d at 1158)).

"[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). The inquiry is "case-by-case," and "defers

to the presiding ALJ, who has seen the hearing up close." *Id*. at 1157. If supported by substantial evidence, the ALJ's findings of fact are conclusive. 42 U.S.C. § 405(g). This means the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the court finds that the evidence "preponderates against" the agency's decision. *Noble v. Comm'r of Soc. Sec.*, 963 F.3d 1317, 1323 (11th Cir. 2020 (quoting *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991)).

## B. The psychological consultative exam by Paul Lysaker, Ph.D.

The administration referred Beauchamp to Paul Lysaker, Ph.D. for a consultative mental status examination on August 8, 2017. (Tr. 478). He found Beauchamp was moderately depressed and appeared to be in considerable pain, but she was fully cooperative and pleasant. (Tr. 480). Lysaker found Beauchamp was within normal limits in nearly all respects, including, for example, speech, affect, orientation, thought process, and memory. (Tr. 480-481). Beauchamp also reported no problems with her daily living activities, and therefore, nothing impacted her functioning. (Tr. 479-480). She was able to fully interpret two proverbs, such that she could form and use abstractions. (Tr. 481). Lysaker reported that Beauchamp's ability to perform calculations appeared below normal limits, in part, because she miscalculated one out of four math problems. (Tr. 481-482). Yet, she was able to manage her own finances. (Tr. 483).

Lysaker found *no linkage* between mental health and occupational problems. (Tr. 480). In other words, Lysaker found no mental capacity limitations in Beauchamp's ability to work. For context, Lysaker noted that Beauchamp previously worked as a housekeeper and worked for several years at a post office. (Tr. 480). Lysaker completed a medical source statement to reflect his findings. He diagnosed her with unspecified depression, which was exacerbated by recent losses tied to a serious motorcycle accident. (Tr. 482). While Beauchamp appeared depressed, Lysaker was easily able to establish rapport with her. Overall, he believed Beauchamp was able to learn, remember, and comprehend simple instructions as well as attend to and carry out simple tasks. She could also learn to carry out simple new tasks. (Tr. 483).

For disability cases filed after March 27, 2017—such as this one—an ALJ does not defer or give any specific evidentiary weight to a medical opinion. 20 C.F.R. § 404.1520c(a). Instead, an ALJ assesses the persuasiveness of a medical source's opinions in light of the following five factors, with the first two being the most important: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length, frequency, and purpose of the examining and any treatment relationship; (4) specialization; and (5) other factors, such as the source's familiarity with other evidence concerning the claim, that tend to support or contradict the medical opinion. 20 C.F.R. § 404.1520c(a)-(c).

To the extent Lysaker's conclusions could be construed as an opinion that Beauchamp was limited to simple work, Beauchamp argues that the ALJ's reasons for finding Dr. Lysaker's opinion unpersuasive are not supported by substantial evidence. (Doc. 20, pp. 10-11). The ALJ found Lysaker's opinion unpersuasive for four reasons. First, the limitation to simple work is inconsistent with the mental status examination. Second, the evidentiary record fails to support an ability to perform only simple work. Third, Beauchamp did not attend mental health treatment.[5] And fourth, Beauchamp engages in "high-level activities" of daily living. (Tr. 32).[6]

---

[5] If failing to follow prescribed medical treatment is not one of the "principal factors in the ALJ's decision," then the ALJ is not required to delve into a claimant's ability to pay, and this failure is not reversible error. *Brown v. Comm'r of Soc. Sec.*, 425 F. App'x 813, 817 (11th Cir. 2011); *see Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (holding ALJ was not required to determine whether claimant was financially able to afford treatment because the finding that the claimant was not disabled "was not significantly based on a finding of noncompliance"). Here, evidence that Beauchamp was unable to afford medical care was not the primary reason for discounting any opinions. (Tr. 32). Instead, the ALJ cited and primarily relied on other evidence for discounting them.

[6] Beauchamp argues her daily activities do not reach a "high-level" as determined by the ALJ. (Doc. 20, p. 14). But her self-reported activities are correctly characterized as high-level. An article in the National Library of Medicine states that activities of daily living (ADL) can be divided into basic ADL and ADL that are "high-level." *High-level activities of daily living and disease-specific mortality during a 12-year follow-up of an octogenarian population*, CLIN INTERV AGING. 2013; 8: 721–728, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3693727/ (last visited Sept. 24, 2021). Basic ADL include "eating, bathing, dressing, being mobile, toileting, and maintaining urinary control." *Id.* Examples of high-level ADL are "shopping; preparing meals; housekeeping; doing laundry; going out to nearby places; and managing transportation, medication, and money." *Id.* By her own admission, Beauchamp's ADL include shopping, preparing meals, housekeeping, going out alone, driving, managing money and managing medication. (Tr. 233, 234, 480). Accordingly, the ALJ's characterization of Beauchamp's ADL as high-level is reasonable, consistent with medical terminology and strongly supported by the record. (Tr. 32).

The ALJ thoroughly summarized Lysaker's opinion and parroted his findings in the decision. (Tr. 27). In evaluating Lysaker's opinion for consistency, the ALJ found that despite Beauchamp's claims of cognitive limitations, the mental status evaluation was generally within normal limits, except for having a depressed mood. (Tr. 31-32). Thus, the ALJ found Lysaker's evaluation inconsistent with an opinion that Beauchamp was limited to: attending, learning, and carrying out simple tasks and instructions; and responding to minor changes in routine. (Tr. 32).

After review of Lysaker's evaluation, the Court finds that substantial evidence supports the ALJ's decision that Lysaker's ultimate opinion that Beauchamp is limited to comprehending only simple instruction, carrying out only simple tasks, and responding to only minor changes in routine is unpersuasive. This opinion is inconsistent with Lysaker's own mental status evaluation of Beauchamp. Notably, Lysaker found Beauchamp's mental health was not linked to occupational problems and it had no impact on her activities of daily living. (Tr. 480). Lysaker also found Beauchamp essentially within the normal limits for much of the mental evaluation other than a moderately depressed mood. (Tr. 478-483). He further found Beauchamp's concentration and memory intact; and she was able to manage her own finances. (Tr. 483). Finally, Lysaker simply concluded from his evaluation—but did not explain—which of his findings in the evaluation support limitations to only

minor changes in routine or being "likely to be able to learn to carry out simple new tasks." (Tr. 483).

Beauchamp also argues other evidence in the record is consistent with Lysaker's opinion to limit her to simple tasks. (Doc. 20, p. 11). Beauchamp testified that she had difficulty remembering to carry out her assigned tasks at her last job. (Doc. 20, p. 12). She also contends many of the treatment notes mention complaints of "brain fog," impaired memory, impaired concentration, anxiety, and depressed mood. (Doc. 20, p. 12). And Beauchamp cites her primary care records that show regular complaints of depression, anxiety, and other mental health problems. (Doc. 20, p. 12). Beauchamp argues the ALJ found two records in which the doctors did not evaluate her mental health, but then ignored abnormal mental status findings in the records of her primary care providers. (Doc. 20, p. 12).

The ALJ found that other treatment records show Beauchamp had normal mental status examinations and was oriented times four,[7] pleasant, cooperative, and had no signs of depression, anxiety, or agitation. (Tr. 27). Indeed, some records show that Beauchamp had normal mental status examinations, but others show anxiety, insomnia, and depression. (*Compare* normal mental-status examinations (Tr. 525,

---

[7] Oriented times four generally refers to awareness of person, time, place, and situation. *See* https://doctorlingo.com/definition/alert-and-oriented-x4 (last visited Sept. 24, 2021); *see also* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1324 (30th ed. 2003) (defining "orientation" as "awareness of one's environment, with reference to place, time, and people").

529, 533, 537, 556, 558), *with* impaired mental-status examinations (Tr. 442, 444, 448, 452,[8] 456, 458, 560)). During the consultative physical examination, the ALJ noted Beauchamp showed no signs of anxiety, depression, or emotional instability. (Tr. 30, 470). Even if Beauchamp complained of anxiety and depression to various medical providers and has been diagnosed with such ailments, a diagnosis alone does not establish a functional limitation, and the mere existence of an impairment does not reveal its effect on a claimant's ability to work. *Fields v. Comm'r of Soc. Sec.*, No. 3:16-cv-698-PDB, 2017 WL 4054508, *7 (M.D. Fla. Sept. 14, 2017) (citing *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005)).

Beauchamp has not shown that any other acceptable medical source found her mental impairments caused functional limitations consistent with Lysaker's opinion that limited Beauchamp to simple tasks and minor changes in routine. As a result, the Court finds substantial evidence supports the ALJ's decision finding Dr. Lysaker's opinion was inconsistent with his mental evaluation of Beauchamp and unsupported by other evidence in the record.

---

[8] Medical records from Nurse Morrison ambiguously state: "Not suicidal, No sleeping problems, Anxiety, Depression, Irritability." (Tr. 452, 456). The ALJ and both parties cite these records in support of their positions. The issue becomes what word or words does "no" modify. (Tr. 452). Does "no" modify just "sleeping problems" or, alternatively, does it also modify anxiety, depression, and irritability? (Tr. 27; Doc. 20, pp. 12, 20-21). When looking at these medical records as a whole, including Beauchamp's complaints and Morrison's other findings, the word "no" appears to modify only sleeping problems. (*See* Tr. 452, 456, 458).

### C. The Physical Residual Functional Capacity Questionnaire by Tamara J. Morrison, FNPC

Nurse Morrison partially completed a Physical Residual Functional Capacity Questionnaire, dated November 16, 2017. (Tr. 547-550). Only about half of the questionnaire was completed. In the areas that she did fill out that are legible, Morrison included diagnoses of anxiety, depression, and difficulty concentrating. (Tr. 547-548). She also found that Beauchamp's symptoms would frequently interfere with her attention and concentration. (Tr. 548). Morrison concluded that Beauchamp was incapable of even low stress jobs, but qualified this finding by stating "at least for now" and explaining she would defer to neurology and possibly psychiatry for further evaluation. (Tr. 548). Morrison also found Beauchamp would be absent more than four workdays per month, but recommended Beauchamp be evaluated by a specialist. (Tr. 550).

Beauchamp argues the ALJ's reasons for finding Morrison's opinion to be unpersuasive are not supported by substantial evidence. (Doc. 20, pp. 10, 14-16). The ALJ provided four reasons for finding Morrison's opinions unpersuasive. First, Morrison is not a mental health practitioner, which Beauchamp concedes. (Doc. 20, p. 15). Second, Morrison's opinions were inconsistent with Lysaker's mental status evaluation. Third, Beauchamp did not receive any mental health treatment.[9] And

---

[9] *See supra* note 5.

fourth, Morrison's opinions are not supported by Beauchamp's activities of daily living.[10] (Tr. 32).

Substantial evidence supports the ALJ's finding that Morrison's opinions were unpersuasive because Morrison—a certified family nurse practitioner—was not an acceptable medical source. *See* 20 C.F.R. § 404.1502(a)(7) (listing a "Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title" may be considered an acceptable medical source but only "for impairments within his or her licensed scope of practice"). Morrison even conceded that she was not qualified, evidenced by her repeated deference to a neurologist or psychiatrist (or other specialist) for further evaluation. (Tr. 548, 550). While Morrison's admitted lack of credentials and failure to complete the entire "physical" RFC questionnaire provided the ALJ with substantial evidence to discount her opinions, the ALJ also gave more reasons to discount the opinions, including inconsistency with Lysaker's mental status evaluation.

Beauchamp argues Morrison's and Lysaker's opinions are actually consistent. She claims that Lysaker's finding that she performed below normal limits on tests of concentration and simple calculations aligns with Morrison's finding that Beauchamp would have trouble with jobs that involve even low levels of stress.

---

[10] *See supra* note 6.

(Doc. 20, p. 15). And Beauchamp asserts Lysaker did not make any findings regarding absenteeism from work and, therefore, there is no inconsistency there. (Doc. 20, p. 15). But Beauchamp's arguments are without merit. Beauchamp's opinions are not supported by evidence in the record, such as mental status examinations from both psychological and physical consultative examinations or Beauchamp's activities of daily living.

Lysaker, a trained psychologist, made findings that conflict with Morrison's opinion. While Morrison found that Beauchamp's anxiety and depression would frequently interfere with her attention and concentration, Lysaker found Beauchamp's concentration was intact. (Tr. 483). He also found no linkage between Beauchamp's mental health and occupational problems. (Tr. 480). Furthermore, while Lysaker's opinion is silent on whether Beauchamp would miss more than four days of work per month, his silence is telling. Because he found no linkage between Beauchamp's mental health and occupational problems, it stands to reason that Beauchamp would appear for work with no interference from her mental health issues. Accordingly, substantial evidence supports the ALJ's decision to find Morrison's opinion as to Beauchamp's limitations unpersuasive.

### III. Conclusion

Upon consideration of the submissions of the parties and the administrative record, the Court finds substantial evidence supports the ALJ's decision and there

15

was either no error or no harmful error in the ALJ's application of the correct legal standard.

Accordingly, the decision of the Commissioner is **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of Court is directed to enter judgment, terminate any pending motions and deadlines, and close the case.

**ORDERED** in Fort Myers, Florida on September 24, 2021.

_____
NICHOLAS P. MIZELL
UNITED STATES MAGISTRATE JUDGE